UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

U.S. EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
                                                       )
                Plaintiff, )      Case No.  2:06-cv-01104-LDG-GWF
                                                       )
vs. )      **ORDER**
                                                       )
CONSOLIDATED RESORTS, INC., )      **Motion to Compel - #71**
                                                       )
                Defendant. )
_____)

      This matter is before the Court on Defendant's Motion to Compel Submission to Independent Mental Examination (#63), filed February 22, 2008; Plaintiff EEOC's Response in Opposition to Defendant's Motion to Compel Submission to Independent Mental Examination (#68), filed March 10, 2008; and Defendant's Reply in Support of Motion to Compel Submission to Independent Mental Examination (#71), filed March 27, 2008.  The Court conducted a hearing in this matter on April 3, 2008.

**BACKGROUND**

      The Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") has brought this action against Defendant Consolidated Resorts, *et al.*, for violation of Title VII of the Civil Rights Act. The EEOC alleges that Defendant has engaged in unlawful employment practices involving sexual harassment and sex-based discrimination of the Charging Party, Erin Dawson, in the form of verbal, visual and physical harassment.  In its prayer for relief, the EEOC seeks "to make whole Charging Party by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, loss of enjoyment

of life, and humiliation, in amounts to be determined at trial." *Amended Complaint (#3),* p. 5, ¶ E.  The Charging Party, Ms. Dawson, has not intervened in this action.

The EEOC alleges that between June 2004 and September 11, 2004 Ms. Dawson was forced, on three occasions, to perform oral sex on one of her supervisors, Ramiro Rouco, under the threat of losing her job.  Mr. Rouco also allegedly touched Ms. Dawson's breasts and private body area, exposed his genitals to Ms. Dawson, and made sexually offensive statements to her.  The EEOC also alleges that other employees asked Ms. Dawson to expose her uncovered breasts to them and that one supervisor, Chuck Rouse, sent Ms. Dawson a sexually offensive postcard.  Defendant's employees have denied Ms. Dawson's allegations.  Mr. Rouco has specifically denied that he engaged in any sexual conduct with Erin Dawson. *Motion to Reconsider (#55), Exhibit "A", Rouco Deposition,* pp. 161-162.  As an alternative defense, Defendant alleges that if any of its supervisors or other employees engaged in sexual conduct with Ms. Dawson, the conduct was not unwelcome.  This defense is based on Ms. Dawson's allegedly sexually provocative or promiscuous attire, conduct and speech in Consolidated Resort's workplace.

Defendant's instant motion seeks an order compelling Ms. Dawson to submit to a mental examination pursuant to Fed.R.Civ.Pro. 35.  Defendant bases its motion on the allegations set forth in the EEOC's Amended Complaint which seeks recovery of damages for Ms. Dawson's emotional distress.  Defendant's motion is also based on evidence which allegedly demonstrates that Ms. Dawson is seeking damages for continuing severe or extreme emotional distress resulting from the alleged sexual harassment.  The evidence relied on by Defendant in support of its request for a mental examination is summarized as follows:

Ms. Dawson first complained to Defendant of Mr. Rouco's alleged sexual abuse on or about September 11, 2004.  Shortly afterwards, she also filed a complaint with the police department regarding Mr. Rouco's alleged conduct.  Between September 11 and November 8, 2004, Ms. Dawson met with and exchanged phone calls and letters with Defendant's human resources director and general counsel regarding her sexual harassment allegations.  As a result of Ms. Dawson's complaint, Defendant transferred her to work at another facility, where she would not be under Mr. Rouco's supervision or have contact with him, while Defendant investigated her allegations.

In an "Incident Investigation Form" that Ms. Dawson filled out on September 16, 2004, *Motion (#63), Exhibit "G"*, p. EEOC 0049, she stated, in response to a question as to how the incident affected her and whether her job has been affected: "Yes. Caused emotional distress. Because of having to leave early on some days it caused financial loss." In a handwritten note that Ms. Dawson apparently wrote about this same time, she stated that "I thought I could handle the stress, [unintelligible] with what happened coupled with being made to leave my job along with no support I finally cracked." *Id.,* p. ED 0055.

In a September 21, 2004 letter to Defendant's human resources director, Ms. Dawson stated: "This situation has become a living nightmare." *Id.,* p. EEOC 0057. In another letter, dated September 30, 2004 to Defendant's general counsel, Ms. Dawson stated: "In closing, I do appreciate your offer to 'make me whole' financially. The fact that you promised to have the company compensate me 'wholly' during the term of this investigation is dually (sic) welcomed. However, I doubt that I will ever be able to fully or wholly recover financially or emotionally from this experience now or ever in the future." *Id.,* EEOC 0074. This and the other letters that Ms. Dawson sent to Defendant were drafted by her then boyfriend, Robert Kerner.

In an October 5, 2004 letter to Defendant's human resources director, Ms. Dawson stated "please be reminded that this is my life and career that surround these issues and incidents. I have been pushed to the point emotionally of becoming physically ill on a daily basis." *Id., Exhibit "G",* p. 323. Ms. Dawson also noted that during a meeting with the human resources director and Defendant's counsel, her then boyfriend, Robert Kerner, told them "that emotionally, Erin has become the equivalent of a train wreck." *ld.,* p. 324. Ms. Dawson also stated that the previous day, she spent the morning at St. Rose Hospital and was prescribed medication to manage her nausea and sleeplessness. She also stated: "Quite frankly, the process of going through your 'investigation process' is almost as devastating as the illicit acts themselves." *Id.,* at 324.

A co-worker of Ms. Dawson also sent a handwritten statement to Defendant's human resources director on or about September 22, 2004 in which he relayed information that Ms. Dawson had provided him regarding the alleged sexual assault. According to this co-worker, Ms. Dawson told him that "[s]he took a Xanax to go to sleep." *Id., Exhibit "I",* p. EEOC 0063.

3

1    Defendant has also attached October 3, 2004 medical records from St. Rose Hospital's urgent
2 care facility which show that a Dr. Karajohn prescribed Ambien and Promethazine to Ms. Dawson.
3 *Motion (#63), Exhibit "L"*.
4    In Plaintiff's Amended Responses to Interrogatories dated July 10, 2007, Plaintiff stated that
5 "[a]s a result of the sexual harassment of Ms. Dawson and the hostile work environment that she
6 experienced, she suffered emotional distress.  She experienced nausea and headaches which she
7 believed were caused by the harassment." *Id., Exhibit "D"*, p. 7.  In response to an interrogatory
8 asking Plaintiff to identify any health care providers who examined or treated Ms. Dawson for the
9 alleged harassment, Plaintiff identified the visit to Dr. Karajohn on October 3, 2004 and stated that
10 Plaintiff was "[e]xperiencing headaches and nausea." *Id.,* p. 22.  In response to another interrogatory
11 which asked Plaintiff to identify any medical doctors, psychiatrists, psychologists, therapists and
12 chiropractors who have examined or treated Ms. Dawson within the past ten years, Plaintiff identified
13 only a doctor who performed breast augmentation surgery on Ms. Dawson approximately 9 years
14 earlier.  Plaintiff also stated that Ms. Dawson was required to attend group counseling in 2006 in Cedar
15 City, Utah for a DUI offense.  *Id.,* p. 23.
16    Defendant also relies on a workers compensation claim that Ms. Dawson filed in November
17 2004 as a result of the alleged sexual harassment.  *See Exhibit "M"*.  The worker's compensation
18 records indicate that Ms. Dawson submitted a claim because Defendant told her she would have to
19 seek worker's compensation in order to obtain compensation for her injuries.  Dr. Karajohn apparently
20 signed a physician's statement regarding Ms. Dawson's worker's compensation claim indicating that
21 he prescribed Ambien for anxiety or distress. *Id.*
22    At her deposition taken on February 4, 2008, *Motion (#63), Exhibit "C",* Ms. Dawson was
23 questioned about the statements in her September-November 2004 letters.  Ms. Dawson confirmed that
24 she stated in her September 21, 2004 letter that the situation had become a living nightmare and that,
25 in fact, was how she felt.  Ms. Dawson testified that "[i]t was horrible." *Exhibit "C"*, p. 462:8-15.
26 She also confirmed that she sought medical treatment for her distress and obtained prescribed
27 medication from Dr. Karajohn. *Id.,* pp. 462:16 to 463:1.  Ms. Dawson was also questioned about the
28 statements in her September 30, 2004 letter in which she stated that she doubted that she would ever be

4

able to fully or wholly recover financially or emotionally from the experience.  The following testimony occurred:

> So was it your contention that you were going to – that you had suffered emotional distress as a result of this?
> A. Yes.
> Q. And you were also telling the company, Mr. Blair, that you were going to continue to suffer emotionally as a result of the alleged harassment, correct?
> A. I think I am.

*Motion (#63), Exhibit "C"*, p. 480:17-25.

Defendant also questioned Ms. Dawson about the statements in her October 5, 2004 letter in which she discussed her visit to St. Rose Hospital and the devastating effect that the alleged harassment had on her.  Ms. Dawson testified that the statements in the letter were truthful, but a little dramatic.  *Id., Exhibit "C",* p. 489:7-12.  The following testimony then occurred:

> Q. Because you felt that the impact on you emotionally from misconduct was devastating, correct?
> A. Yes.
> Q. And would be devastating perhaps for the rest of your life, correct.
> A. Hopefully not.
> Q. But you have suffered long-term emotional distress, correct?
> A. I think about it.

*Id.*, at 489:13-22.

Ms. Dawson was also questioned about statements she made in a letter to Defendant's human resources director dated November 8, 2004.  The following testimony occurred:

> Q. In this letter that you authored, you state in the second paragraph, I can no longer endure the added stress and mental anguish. Do you see that?
> A. Yes.
> Q. And did you believe that you were suffering stress and mental anguish as a result of the conduct at Consolidated?
> A. Yes.
> Q. In the fourth paragraph the very end of that paragraph, you state, This situation has changed my life forever.  Do you see that?
> A. Yes.
> Q. You were referring to the sexual harassment and the consequences of that that you allegedly experienced?
> A. Yes.
> Q. And when you say has changed your life forever, you mean emotionally and otherwise?
> A. Yes.

*Id.,* pp. 500:17-501:12.

5

1       Defendant has also attached as an exhibit the February 25, 2006 medical records from the
2   Valley View Medical Center in Cedar City, Utah. *Motion (#63), Exhibit "E"* These records were
3   provided by the EEOC's counsel under a cover letter dated October 17, 2007 which states that the
4   records were provided "[p]er the parties' agreement that the EEOC would gather Ms. Dawson's
5   medical records and disclose to your office those that implicate emotional distress issues ..." *Id.* The
6   February 25, 2006 emergency room report states that Ms. Dawson complained of left arm tenderness
7   which woke her up at 2:00 a.m. Ms. Dawson reported light headedness and nausea and felt chest
8   heaviness at 7:00 a.m. "She is extremely upset thinking she might be having a heart attack." The
9   record further states: "Apparently she has a family history of coronary disease. Her dad had a bypass
10  in his late 50s. The patient denies any chest pain or pressure with exertion. She denies any shortness
11  of breath." *Id.* The physician's diagnosis was acute left arm neurapraxia and acute anxiety reaction.
12  The physician told the Plaintiff that she needed close follow-up with Dr. Smallwood so that she can
13  arrange a cardiac stress test to verify that she does not have any sort of coronary disease. *Id.*
14      There is nothing in this record which references Ms. Dawson's 2004 sexual harassment
15  allegations or which suggests that the episode was a continuation of ongoing emotional distress/mental
16  stress that she allegedly suffered as a result of the sexual harassment. Nor is there any indication that
17  the EEOC or Ms. Dawson claim that this medical episode is related to the emotional distress/mental
18  distress she allegedly suffered as a result of the 2004 sexual harassment. Although Defendant's
19  counsel questioned Ms. Dawson at her deposition about the information contained in this record and
20  verified the history she gave, Defendant's counsel did not ask whether Ms. Dawson believes or
21  contends that this episode was related to the emotional distress she allegedly experienced as a result of
22  the sexual harassment or Defendant's handling of her complaint. *See Exhibit "C"*, pp. 566:2 to
23  567:19.
24      Finally, Defendant has attached as an exhibit to its Motion a February 22, 2007 email that Ms.
25  Dawson's ex-boyfriend, Robert Kerner sent to the EEOC's counsel. Mr. Kerner apparently attached to
26  this email a legal memorandum regarding the liability of an entity for sexual harassment committed by
27  its independent contractors. Mr. Kerner's email states:
28  . . .

> My motivation to contact you today was driven by a phone call that I received from Ms. Dawson late this afternoon. Ms. Johnson, I have heard that same traumatized voice a hundred times since August of 2004. A normal human being would have folded under this internal pressure long ago. I applaud her ability to weather this seemingly endless consternation. I am also proud to be of some solace to her when she is confronted with the same and I applaud your efforts toward resolve on her behalf.

*Motion (#63), Exhibit "H",* p. EE0C 0667.

In its Response to Defendant's Motion, the EEOC has attached a Declaration of Erin Dawson made "under penalty of perjury under the laws of the State of Utah". *Response (#68)*. Ms. Dawson's Declaration states that "during and shortly after the time that I was sexually harassed, in the Summer of 2004, I had feelings of fearfulness, humiliation, stress and anxiousness. I had difficulty sleeping, and I had headaches and nausea." ¶ 2. She also states that she went to the emergency room in October 2004 and was treated by Dr. Karajohn, an emergency medicine and family medicine physician who prescribed Ambien to help her sleep and Promethazine for her nausea. ¶ 3. She then states:

> After a while, my feelings of anxiety, stress and humiliation began to dissipate and by about six months after leaving Consolidated Resorts, I began to feel better and able to move on with my life.

*Id.,* ¶ 4.

Ms. Dawson's Declaration also references her emergency room visit on February 25, 2006 in she which states: "I became worried because there is a history of heart problems in my family. The doctor told me I had an anxiety attack." ¶ 5. Ms. Dawson's Declaration does not assert that this episode is related to her emotional distress resulting from the alleged sexual harassment. Ms. Dawson also states that she was never prescribed Xanax. She states that a co-worker observed her upset condition following one of the harassing events involving Mr. Rouco in the Summer of 2004 and offered her a Xanax pill. She states that she took one-half of the pill and that is the only occasion on which she has taken Xanax. ¶ 6. Ms. Dawson further states that she has never sought or received psychiatric or psychological treatment for emotional distress because of the harassment. ¶ 7. She concludes her Declaration by stating:

> I still feel sad and sometimes anxious when I think about the harassment like, for example, when I had to have my deposition taken or when I

|   |   |
|---|---|
| 1 | heard anything about Consolidated Resorts, but otherwise felt pretty much back to normal. |

*Id.,* ¶ 8.

## DISCUSSION

Fed.R.Civ.Pro 35(a)(1) requires that the moving party show both that the mental condition of the party is in controversy and that good cause exists for the mental examination. In *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 241-244 (1964), the Supreme Court held that these elements are not met by mere conclusory allegations of the pleadings–nor by mere relevance to the case–but require an affirmative showing by the movant that each condition as to which examination is sought is really and genuinely in controversy and that good cause exists for ordering a particular examination. The ability of the movant to obtain the desired information by other means is also relevant. *Schlagenhauf* states that the Rule requires a discriminating application by the district court as to whether the movant has adequately demonstrated the existence of the Rule's requirements. The Court also noted that there are situations where the pleadings alone are sufficient to meet the controversy requirement of the Rule such as where a plaintiff in a negligence action asserts mental or physical injury.

Whether a plaintiff in a Title VII employment discrimination action may be required to submit to an independent mental examination has been frequently litigated. While a few courts have held plaintiff's mental condition is in controversy when the complaint seeks to recover damages for emotional distress as an element of the Title VII claim, most federal courts apply the factors set forth in *Turner v. Imperial Stores*, 161 F.R.D. 89, 95 (S.D.Cal. 1995). *Turner* states that a plaintiff places her mental condition in controversy for purposes of Rule 35, when, in addition to making a claim of emotional distress, one or more of the following is present: (1) a cause of action for intentional or negligent infliction of emotional distress; (2) an allegation of a specific mental or psychiatric injury or disorder; (3) a claim of unusually severe emotional distress; (4) plaintiff's offer of expert testimony to support a claim of emotional distress; and/or (5) plaintiff's concession that his or her mental condition is "in controversy" within the meaning of Rule 35(a). *See also Fox v. Gates Corp.*, 179 F.R.D. 303, 307-08 (D. Colo. 1998); *Greenhorn v. Marriott Intern., Inc.*, 216 F.R.D. 649, 651 (D.Kan. 2003); *O'Sullivan v. State of Minnesota*, 176 F.R.D. 325 (D.Minn. 1997); and *Javeed v. Covenant Medical*

*Center*, 218 F.R.D. 178 (N.D. Iowa 2001).

In this case, neither the EEOC nor Ms. Dawson have alleged a cause of action for intentional or negligent infliction of emotional distress. Nor do they allege that Ms. Dawson suffered a specific mental or psychiatric injury or disorder. The EEOC also states that it does not intend to present expert testimony to support a claim of emotional distress on behalf of Ms. Dawson. The EEOC also does not concede that Ms. Dawson's mental condition is in controversy within the meaning of the Rule. The issue therefore is whether the EEOC is making a claim on Ms. Dawson's behalf for unusually severe emotional distress which warrants an independent mental examination.

In *Greenhorn v. Marriott Intern., Inc.*, 216 F.R.D. 649, 651 (D.Kan. 2003), the court ordered that the plaintiff submit to a mental examination where she alleged in her amended complaint that defendant's conduct had caused her to sustain lasting and permanent emotional injury in the form of emotional trauma causing insomnia, severe depression, avoidance, withdrawal, suicidal ideation, suspiciousness, social discomfort, low self esteem, and resentfulness. The plaintiff also alleged she continued to suffer from several of these symptoms and expected to do so in the future. The court held that these were not simply "garden variety" emotional distress symptoms and that plaintiff had placed her mental condition in controversy. The court also held that there was good cause for a mental examination because plaintiff's allegations of emotional distress were sufficiently serious and sweeping that an average lay person might not be able to evaluate properly the nature, extent and cause of the injuries plaintiff claimed to have sustained. *Id.*, 216 F.R.D. at 652. *See also Javeed v. Covenant Medical Center*, 218 F.R.D. 178 (N.D. Iowa 2001), in which the court held that plaintiffs' complaints included a variety of specific symptoms which went beyond what the court would characterize as "garden variety" emotional distress. Such alleged ongoing severe emotional distress justifies an independent examination even where plaintiff does not intend to call an expert witness to support her mental distress claims. *Thiessen v. General Electric Capital Corp.*, 178 F.R.D. 568, 571 (D.Kan. 1998).

Ms. Dawson claims that she was subjected to egregious sexual harassment and abuse by Mr. Rouco from June to September 11, 2004. During the time this abuse allegedly occurred, and while Ms. Dawson was engaged in communications with Defendant's human resource director and general

9

counsel between September and November 2004, Ms. Dawson claimed that she experienced emotional distress which manifested itself in headaches, nausea and insomnia.  Ms. Dawson also allegedly took half a Xanax pill that was given to her by a co-worker.  She did not seek medical attention for her distress symptoms, however, until October 3, 2004, a few weeks after she complained about the abuse to Defendant.  On that date, she saw an urgent care physician Dr. Karajohn, who prescribed Ambien for her stress and Promethazine for nausea.  There is no indication that Ms. Dawson took these medications for an extended time or followed up with Dr. Karajohn or any other physician for treatment of her emotional stress resulting from the alleged sexual harassment.  Although Ms. Dawson received medical attention in February 2006, regarding her concern that she might be having a heart attack, and was diagnosed for anxiety reaction, there is no indication in the records that this episode relates to emotional distress allegedly caused by the sexual harassment.  There is also no indication that the EEOC or Ms. Dawson claim that this February 2006 episode relates to the alleged sexual harassment.  Defendants did not explore this issue during Ms. Dawson's deposition sessions.

      The principal basis for Defendant's motion are the various statements that Ms. Dawson made to Defendant's representatives between September 11, 2004 and November 8, 2004, in which she described the alleged sexual abuse as a nightmare and horrible, that she suffered extreme distress, that she believed her life was changed forever and that she did not think she would ever fully recover emotionally.  If Ms. Dawson was claiming that she continues to suffer from emotional distress in the manner that she claimed she was experiencing in her September-November 2004 letters, then the Court would have no reservation in concluding that her mental condition is in controversy and that good cause for a mental examination exists.  Defendant's counsel, however, failed or chose not to question Ms. Dawson about the progression of her mental condition during the ensuing three years after her last communication with Defendant's representatives.  Instead, Defendant attempts to argue that Ms. Dawson's testimony about her emotional distress as set forth in her September-November 2004 letters is representative of the emotional distress that she claims to have suffered thereafter and

up to the present time.[1]

In response to Defendant's motion, the EEOC has filed a sworn declaration by Ms. Dawson in which she states that during and shortly after the time she was sexually harassed in the Summer of 2004, she had feelings of fearfulness, humiliation, stress and anxiousness and that she had difficulty sleeping, headaches and nausea. She further states that after awhile these feelings dissipated and by about six months after she left Consolidated Resorts, i.e. May 2005, she began to feel better and able to move on with her life. She states that she experiences sadness or anxiousness if she has to think about the harassment, such as when her deposition was taken. Otherwise, she indicates that she has felt "pretty much back to normal." This Declaration eliminates the basis for Defendant's contention that Ms. Dawson is claiming "ongoing, severe and permanent" emotional distress. Defendant accuses the EEOC and Ms. Dawson of engaging in self-serving gamesmanship by submitting a declaration in contradiction to her deposition testimony in order to avoid being required to undergo a mental examination. *See Reply (#71),* p. 2. Ms. Dawson's Declaration, however, does not contradict her deposition testimony since Defendant did not explore her post-November 2004 mental condition.

If Mr. Rouco coerced Ms. Dawson into engaging in oral sex and submitting to other unwanted sexual contact, then the type of emotional distress symptoms she claims to have suffered in the immediate aftermath of the alleged abuse–headaches, nausea and insomnia– are neither unusually severe or beyond the common understanding of lay persons. On the other hand, if the jurors conclude that the sexual conduct did not occur or was consensual, then they are equally capable of deciding that Ms. Dawson did not, in fact, experience emotional distress as a result of sexual harassment. Lay jurors are also reasonably capable of determining without expert testimony whether a person who claims to have been victimized by the type of sexual misconduct that Ms. Dawson alleges was perpetrated by Mr. Rouco would begin to get over it after approximately 8 to 10 months as she states in her declaration.

---

[1] The Declaration of Defendant's proposed mental examiner, Dr. Joann Behrman-Lippert, attached to Defendant's *Reply (#71),* appears to accept Defendant's contention, based on Ms. Dawson's testimony about her 2004 letters, that Ms. Dawson's alleged emotional distress damage is "ongoing, severe and permanent" . *Id.,* ¶¶ 5-6.

As *Ricks v. Abbott Laboratories*, 198 F.R.D. 647, 649 (D.Md. 2001) states:

> When emotional distress is unusually severe or alleged in clinical terms, or when another party intends to offer expert testimony about the distress, the testimony of an expert would help the trier of fact understand the nature, severity, and characteristics of the emotional distress. A trier of fact, however, does not need help understanding the ordinary grief, anxiety, anger, and frustration that any person feels when something bad occurs. Most triers of fact are already experts in that. Therefore, a defendant would not need to offer expert testimony on this kind of emotional distress. By the same token, a defendant would not need to consult an expert to understand the ordinary emotional distress that any person in the plaintiff's claimed position would experience. Because laypersons can understand this kind of ordinary emotional distress without the help of an expert, there is no need for an expert to conduct a mental examination of the plaintiff who claims only ordinary and uncomplicated emotional distress.

Defendant raises the concern that if the Court does not authorize an independent mental examination, Ms. Dawson may hereafter reverse her position and claim more severe emotional distress damages. As indicated above, however, Ms. Dawson's Declaration does not contradict her deposition testimony in a manner which suggests that she will hereafter attempt to allege severe emotional distress if she is able to thwart Defendant's effort to obtain an independent mental examination. Were Ms. Dawson to do so, however, she could be readily impeached with her sworn March 4, 2008 Declaration.[2]  Such a reversal of position would likely destroy the credibility of Ms. Dawson's emotional distress claim, if not the basis for her allegations of sexual harassment.

This potential can also be dealt with in the manner that the Court addressed similar concerns in *O'Sullivan v. State of Minnesota*, 176 F.R.D. 325 (D. Minn. 1997). In that case, the plaintiff had initially alleged in her complaint that she had suffered emotional distress and that it was reasonably certain to continue in the future. However, during the litigation, plaintiff elected not to present any expert testimony at trial and stated that she was not claiming a diagnosable medical or psychological impairment. She also testified at deposition that she considered herself to be in good medical condition. In concluding that an independent examination was unnecessary, the court stated:

---

[2] Defendant, of course, had an opportunity during Ms. Dawson's two days of deposition to more fully explore her mental condition during the past three years, but failed or chose not to do so. It is, therefore, in no position to argue that Ms. Dawson's Declaration is not adequately detailed in describing the course of her mental condition since late 2004.

> Lastly, we are satisfied that the playing field in this case is not presently in need of leveling. The Plaintiff has previously testified-without qualification-that she is in good mental health, and she has unequivocally represented that she is not seeking to recover for a diagnosable psychological condition or disorder, and that she will not be offering expert testimony at Trial as to her mental condition. Moreover, at the Hearing on this Motion, the Plaintiff's counsel went one step further, and assured the Court that the Plaintiff will not present at Trial any expert testimony in any form-including her own testimony as one trained in the field of mental health-which would assert that she has suffered a clinically diagnosable psychological illness, condition or disorder. More importantly, Plaintiff's counsel expressed no objection to our precluding any such evidence as a precondition to our denial of the Motion to Compel a Rule 35 examination and, therefore, such a preclusion is here prescribed.

*O'Sullivan*, 216 F.R.D. at 328.

At the hearing on this matter, the Court read the foregoing passage from *O'Sullivan* to the EEOC's counsel, who provided the Court with substantially the same assurances.

## **CONCLUSION**

Based on the foregoing, the Court concludes that the Charging Party Erin Dawson's mental condition has not been placed in controversy and that good cause does not exist to order her to submit to a mental examination. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Compel Submission to Independent Mental Examination (#63) is **denied.** This order is conditioned on the Plaintiff's representation that neither it nor Ms. Dawson are making any claim for ongoing, severe emotional distress as a result of the alleged sexual harassment or Defendant's conduct in regard to her claim that she was sexually harassed. Any attempt by Plaintiff to introduce evidence of ongoing, severe and/or permanent emotional distress at trial should be precluded.

DATED this 7th day of April, 2008.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge